IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NPF FRANCHISING, LLC<br>c/c Highland Park, Statutory Agent<br>28601 Chagrin Boulevard, Suite 600<br>Cleveland, Ohio 44122,<br><br>    Plaintiff,<br><br>vs.<br><br>SY DAWGS, LLC<br>11093 Darby Loop<br>Conroe, Texas 77385-7413<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO.:<br><br>JUDGE<br><br>VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIONS, MONEY DAMAGES AND OTHER RELIEF<br><br>JURY DEMAND ENDORSED HEREON |

Plaintiff, NPF Franchising, LLC ("NPF", "Franchisor" or "Plaintiff") for its Complaint against Defendant SY Dawgs, LLC ("SY", "Franchisee" or "Defendant") states as follows:

**INTRODUCTION**

1. This action arises from SY's breach of a franchise agreement ("Franchise Agreement") and non-competition and non-disclosure agreement ("Non-Compete Agreement," together with the Franchise Agreement the "Agreements") and between NPF and SY. True and accurate copies of the Agreements are attached hereto as Exhibits A and B respectively.

2. NPF operates the National Pro Fastpitch League (the "League"), a professional softball league in which SY's team, the Scrap Yard Dawgs ("SY Dawgs"), participates. SY breached the Agreements by: (i) competing with NPF by (ii) unilaterally and publicly announcing it was withdrawing from the League; (iii) forming a new team under the name Scrap

1

Yard Fastpitch and entering into direct competition with the League; (iv) directly contacting NPF's suppliers, sponsors and media partners in an attempt to draw them away from NPF and the League; and (v) failing to pay NPF pursuant to its obligations under the Franchise Agreement.

## PARTIES, JURISDICTION AND VENUE

3. NPF is an Ohio limited liability company duly organized and existing under the laws of the State of Ohio. As stated above, NPF operates and maintains the League, which was established in 2004 and is the only existing women's professional softball league in the United States. Prior to SY's withdrawal, the League featured a number of teams (collectively the "Teams"). The Teams participate in athletic competition and inter-League play amongst themselves as well as exhibition games in and throughout the United States.

4. SY is a Texas limited liability company duly organized and existing under the laws of the state of Texas. SY's principal place of business is Conroe, Texas, where it operates its franchise team, the SY Dawgs.

5. The existing Franchise Agreement between the parties includes a provision concerning governing law, jurisdiction and venue, which provides the following:

> This Agreement has been executed in Cleveland, Ohio shall be governed by and construed in accordance with the laws of the State of Ohio * * *. The Franchisee acknowledges that this Agreement is entered into Cuyahoga County, Ohio and that any action sought to be brought by either party shall be brought in the United States District Court for the Northern District of Ohio (Eastern Division) and the parties do hereby waive all questions of personal jurisdiction or venue for the purposes of carrying out this provision.

6. In Addition, the Franchise Agreement also includes a non-disclosure and non-competition agreement (the "Non-Compete Agreement"). The Non-Compete provides the following provision concerning jurisdiction and venue:

> In the event of breach or threatened breach by Associate [SY] of this Agreement, Associate hereby irrevocably submits to the jurisdiction of the state and federal courts of Ohio, and irrevocably agrees that venue for any action or proceeding shall be in the United States District Court for the Northern District of Ohio (Eastern Division). Both parties waive any objection to the jurisdiction of these courts or to venue in such court.

7. This Court has subject matter jurisdiction over this proceeding pursuant to diversity jurisdiction, 28 U.S.C. §1332, in addition to the Agreements, which specifically provide that the parties submit to the jurisdiction of this Court.

8. Under 28 U.S.C. §1391, venue is proper in this jurisdictional district because Plaintiff resides in this district and the Franchise Agreement and Non-Compete Agreement specifically provide that venue is proper before this Court.

## **GENERAL ALLEGATIONS**

9. NPF has been involved for over a decade in attempting to further the sport of professional women's softball. It and its affiliates have invested millions of dollars in support of their teams and in an attempt to grow the sport. As there is a limited market for professional women's softball, NPF has required all of its franchisees to enter into very specific non-competition agreements in order to protect NPF, its franchisees and affiliates.

10. On October 22, 2015, SY entered into the Agreements with NPF to form the SY Dawgs.

11. Relevant to the instant action, the Franchise Agreement provides, among other things: the manner in which the SY Dawgs participate in the League and its management; the use of NPF's branded marks and logos in the promotion of the SY Dawgs; fees and expenses due to NPF for SY Dawgs participation in the League and its management; marketing rights; and territorial restrictions.

3

12. In addition, the Franchise Agreement also includes a Non-Compete Agreement which was entered into at the same time as the Franchise Agreement

13. Generally, the Non-Compete Agreement prevents SY from diverting any business away from SY and the League or entering into any competing business as defined therein

### SY's Breach of the Franchise Agreement

14. On November 20, 2017 legal counsel for NPF provided SY with written notice of its breaches of the Franchise Agreement (the "Notice"). A true and accurate copy of the Notice is attached hereto as Exhibit C.

15. The Notice advised SY of the breaches, as well as any potential penalty that SY may face if it failed to cure the breaches.

16. In addition, the Notice also informed SY that SY Dawgs' general manager, Connie May, had acted in a manner contrary to the best interests of the League in violation of the Franchise Agreement, thereby negatively affecting the reputation of the League, and accordingly, NPF required her suspension pursuant to the terms of the Franchise Agreement.

17. SY failed to cure any of the breaches. And as a result, on November 29, 2017, NPF provided a final notice ("Final Notice") to SY providing that SY had until December 1, 2017 to cure the breaches or face suspension. A true and accurate copy of the Final Notice is attached hereto as Exhibit D.

18. SY failed to cure any of the breaches by December 1, 2017 and was notified of resulting suspension by the League.

### Meeting Between SY and NPF

19. Based on promises to resolve all outstanding issues, on January 24, 2018, the Commissioner of the League met with Joel Bartsch, a representative of SY (the "January

Meeting"). During the meeting, it appeared to NPF that the parties would work to resolve all outstanding differences and prepare for the upcoming season.

20. Based on and in reliance on representations made by SY, its representatives were permitted to attend, participate and become privy to information that was proprietary and confidential to NPF.

### SY's Breach of the Non-Compete Agreement

21. Four days after the January Meeting, without any notice to NPF, SY posted on Facebook that it was unilaterally withdrawing from the League, and that it was immediately going into competition with NPF (the "Facebook Post"). A true and accurate copy of the Facebook Post is attached hereto as Exhibit E.

22. In addition to the Facebook Post, SY posted on the SY Dawgs website its declaration of withdrawal from the League and intent to form a separate league apart from the League (the "January Post") and begin competition with NPF and the League. A true and accurate copy of the January Post is attached hereto as Exhibit F.

23. By making the Facebook Post and the January Post, SY violated the Non-Compete Agreement and irreparably damaged the League, NPF, its franchisees and affiliates.

24. On January 28, 2018 SY sent NPF a letter stating it was withdrawing from the Franchise Agreement (the "January Letter"). A true and accurate copy of the Letter is attached hereto as Exhibit H.

25. The January Letter states that SY was withdrawing from the Franchise Agreement based upon "NPF shutting down the Texas Charge[1]" and the conversion of the Akron Racers to a traveling "at large" team made up of foreign nationals, all of which is not true.

26. Under the Franchise Agreement, even if SY's statements in the January letter were accurate, they do not constitute a breach of the Franchise Agreement, and accordingly are not grounds for SY to terminate or withdraw from the Franchise Agreement.

27. On January 29, 2018, NPF sent SY a cease and desist letter (the "Cease and Desist Letter"). A true and accurate copy of the Cease and Desist Letter is attached hereto as Exhibit H.

28. Among other things, the Cease and Desist Letter demanded that SY cease and desist from any activities that would breach the Non-Compete Agreement, such as representing to the general public that it was an independent professional softball team. In addition, the Cease and Desist Letter informed SY of NPF's decision to terminate SY from the League for cause.

29. To date, SY has failed to indicate that SY would cease its activities in breach of the Non-Compete Agreement.

30. After receiving the Cease and Desist Letter, SY issued a press release ("Press Release") on its website indicating that SY was forming a new independent team named Scrap Yard Fastpitch ("SY Fastpitch").

31. SY also created a separate website for SY Fastpitch that further evidences SY's intent to breach the Non-Compete Agreement.

---

[1] The Texas Charge was a former professional softball team, licensee of NPF, and member of the League originally located in the Dallas-Fort Worth Texas area. Pursuant to the Franchise Agreement, SY held the right of first refusal to acquire the franchise rights of the Texas Charge, and convert the Texas Charge from a licensed team to a franchised team. SY did not exercise its rights, and the Texas Charge dissolved at the expiration of its license agreement with NPF.

32. SY's various actions, statements and internet postings clearly indicate its breach of the Non-Compete Agreement.

### SY's Improper Contact with Sponsors of NPF

33. SY has further violated the Non-Compete Agreement by attempting to affiliate with sponsors, suppliers and media partners of NPF.

34. Specifically, SY has contacted sponsors, suppliers and media partners of NPF to induce them to support SY and to interfere and/or discontinue with NPF's relationships and contracts.

### COUNT ONE
### (Injunctive Relief)

35. NPF incorporates by reference the foregoing allegation contained in paragraphs as if fully set forth herein.

36. The Non-Compete Agreement specifically provides that SY acknowledges and agrees that in the event of any breach or threatened breach of the Agreement, NPF shall be authorized and entitled to seek preliminary and permanent injunctive relief.

37. The above described actions of SY constitute a breach or threatened breach of the Non-Compete Agreement.

38. Additionally, SY is causing, and will continue to cause, irreparable interference with and damage to NPF's business and goodwill, which cannot be adequately compensated in money damages. These irreparable injuries will continue to be suffered unless and until SY, and those acting in concert or participation with it, are compelled to comply with the Non-Compete Agreement.

39. Unless a preliminary and permanent injunctive relief is entered by this Court directing SY, and those acting in concert or participating with it to comply with the Non-

Compete Agreement, NPF will continue to suffer irreparable injury for which it has no adequate remedy at law. The injury that will be inflicted on NPF is greater than that which could result to SY by the granting of the requested injunctive relief. The granting of the requested injunctive relief would not cause injury to the public and NPF is likely to succeed on the merits of the claims asserted herein.

40. Pursuant to the Non-Compete Agreement, SY has agreed that NPF may obtain injunctive relief without posting a bond.

41. Accordingly, NPF is entitled to a preliminary and permanent injunction enjoining and restraining SY, and its members, officers, agents and employees, and all others in active concert or participation with it, from engaging in the aforesaid acts or any other acts constituting a breach of the Non-Compete Agreement.

## COUNT TWO
**(Breach of Contract under Franchise Agreement)**

42. NPF incorporates by reference the foregoing allegation contained in paragraphs as if fully set forth herein.

43. SY has materially breached its obligations to NPF under the Franchise Agreement including by failing to timely pay NPF the various fees and costs due under the Franchise Agreement, including costs incurred as a result of its actions.

44. As a result of SY's breach of its obligations to SY under the Franchise Agreement, NPF has suffered compensatory damages in an amount of at least $75,000 to be specifically proven at trial.

## COUNT THREE
**(Breach of Contract under the Non-Compete Agreement)**

45. NPF incorporates by reference the foregoing allegation contained in paragraphs as if fully set forth herein.

46. The Non-Compete Agreement provides that during the term of the Franchise Agreement, SY shall not:

> divert or attempt to divert any business related to or any customer or account of the Franchise Business, the Company's business, the business of any affiliate of the Company or any other franchisee's business, by direct inducement or otherwise, or divert or attempt to divert the employment of any employee of the Company, any affiliate of the Company, or another franchisee licensed by Company to any Competitive Business by any direct inducement or otherwise.

47. SY materially breached the Non-Compete Agreement by, prior to being terminated, publicly announcing that it was withdrawing from the League and going into competition with the League.

48. The Non-Compete Agreement further provides a covenant not to compete post-termination (the "Post-Termination Provision") as follows:

> Upon termination or expiration of the Franchise Agreement for any reason, Associate agrees that, for a period of 2 years commencing on the effective date of termination or expiration of the Franchise Agreement, [SY] will not have any direct or indirect interest (through any immediate family member of Associate or its beneficial owners or otherwise) as a disclosed beneficial owner, investor, partner, director, officer, manager, employee, consultant, representative or agent in any other capacity in any Competitive Business located or operating: (a) in the Home Territory or any other franchisee's territory; (b) within 100 miles of the Home Territory or any other franchisee's Home Territory; or (c) within 100 miles of any Company or Company's affiliate-owned Franchise Business.

49. The Post-Termination Provision therefore prevents SY from operating a competitive business in its own Home Territory, within a 100 mile radius of its own Home Territory, or any other franchisee's Home Territory. Pursuant to the Franchise Agreement, SY's Home Territory is Scrap Yard Sports Complex, 29607 Robinson Road, Conroe, Texas 77385.

50. SY is operating a Competitive Business in the form of SY Fastpitch at its Home Territory in contravention of the Post-Termination Provision. By operating a Competitive Business at the Home Territory, SY has materially breached the Non-Compete Agreement.

51. As a direct and proximate result of SY's breach of the Non-Compete Agreement, NPF has been damaged in an amount to be determined at trial, including attorneys' fees, in excess of $75,000.

## COUNT FOUR
**(Fraudulent Misrepresentation)**

52. NPF incorporates by reference the foregoing allegation contained in paragraphs as if fully set forth herein.

53. In the January Meeting between NPF and SY, SY made representations to NPF regarding its alleged intent to remedy the Breaches and continue as a part of the League.

54. These representations were material and false when made.

55. These materially false representations were willfully and maliciously made by SY with the intent of misleading NPF and having NPF rely on such representations.

56. NPF reasonably and detrimentally relied on these misrepresentations made by SY.

57. As a direct and proximate result of SY's fraudulent misrepresentations, NPF is entitled to compensatory and punitive damages against SY in an amount to be determined at trial but in excess of $75,000.

## COUNT FIVE
**(Tortious Interference)**

58. NPF incorporates by reference the foregoing allegation contained in paragraphs as if fully set forth herein.

59. Despite having knowledge of the prohibitions contained in the Non-Compete Agreement, upon information and belief, SY has intentionally and willfully disregarded the provisions contained in the Non-Compete Agreement and has intentionally and willfully interfered with the agreements and/or business relationships NPF has with its sponsors.

60. Such intentional and willful interference with NPF's sponsor agreements and/or ongoing business relationships between NPF and its sponsors is for the purpose of self-gain and profit. Such malicious conduct reveals the conscious disregard for rights of, and the great and obvious harm to, NPF.

61. Based upon and as a result of SY's tortious interference, NPF is entitled to compensatory and punitive damages against SY in amount to be determined at trial but in excess of $75,000.

WHEREFORE, Plaintiff demands judgment in favor and against SY Dawgs, LLC as follows:

A. That the Court issue a preliminary and permanent injunction: (i) compelling SY to comply with the Non-Compete Agreement; and (ii) enjoining SY from competing with NPF for a period of two (2) years from the termination of the Non-Compete Agreement;

B. Compensatory damages in excess of $75,000;

C. Punitive damages;

D. Attorney's fees and costs incurred in bringing and prosecuting this action; and

E. Grant such other relief as the Court may require or permit.

Respectfully submitted,

*/s/ Alan N. Hirth*
Alan N. Hirth (0021953)
ahirth@meyersroman.com
T. Kinsey McInturf (0088103)
kmcinturf@gmail.com
MEYERS, ROMAN, FRIEDBERG & LEWIS
28601 Chagrin Blvd. Suite 600
Cleveland, OH 44122
Phone: (216) 831. 0042
Fax: (216) 831.0542
Attorneys for Plaintiff

## JURY DEMAND

Plaintiffs hereby demand a trial by jury, by the maximum number of jurors allowed by law, on all issues so triable.

/s/ Alan N. Hirth  
Alan N. Hirth

## VERIFICATION

I, Cheri Kempf, verify that I have read the foregoing verified complaint and that the facts set forth in the foregoing verified complaint are true and correct to the best of my knowledge, information, and belief.

_____
Cheri Kempf

Sworn to and subscribed in my presence this 2 day of February 2018.

_____
Notary Public    Heather B Schmitt