IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NPF FRANCHISING, LLC, | ) | CASE NO. 1:18CV277 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| SY DAWGS, LLC, *et al.*, | ) | |
| | ) | **REPORT AND RECOMMENDA-** |
| Defendants. | ) | **TION RE MOTION FOR FEES** |
| | ) | **AND COSTS** |

**I.**

Like umping a fastpitch softball game in the midst of a pandemic in front of empty stands, deciding the SY Dawgs' pending motion for fees and costs[1] is best done without crowd noise. There has already been plenty of that in this case.

The SY Dawgs rest their motion on three grounds. From the general to the more specific, those grounds are the inherent powers of this Court, language from one of their agreements with plaintiff NPF Franchising, LLC, and Fed. R. Civ. P. 37. Both federal and Ohio law as well as the facts can be used to support all three arguments. The one that fits best, though, is the one the District Court and, to some degree, the Court of Appeals have already flagged: sanctions for repeated discovery intransigence by NPF and its lawyers.

---

[1] ECF #212, 232.

1

The task of deciding the pending motion is in some ways partially done.  The District Court granted an earlier defense motion for sanctions for discovery violations,[2] and NPF's misconduct became only more brazen.  For the reasons I explain more fully below, I recommend that the SY Dawgs' pending motion be granted.  I further recommend that NPF and its lawyers of record be ordered to pay $224,863.80 to the SY Dawgs with post-judgment interest and with joint and several liability attaching to this sanction.  This number is an appropriate reflection of the reasonable fees and expenses the SY Dawgs incurred in dealing with NPF's repeated discovery intransigence, multiple and ongoing discovery abuses, and NPF's steadfast refusal to comply with court orders associated with its discovery obligations.

This report and recommendation must provide more than my recommended decision for the pending motion.  I was not present for all of the in-court proceedings when NPF's misconduct occurred or was at issue.  I also did not participate in all of the earlier decision-making regarding NPF's misconduct.  I had the benefit of having this matter referred to me three different times, which allowed me to interact directly with each side for certain specific rulings.[3]  The parties' filings, hearing transcripts, and meeting minutes help fill in other gaps, but these written documents don't allow me to assess in-person intangibles like demeanor, tone of voice, attitudes, and the like—factors that could affect a determination on sanctions.  Calculating sanctions requires judicial assessment of a

---

[2] ECF #171.
[3] ECF #11, 71, and 218.

party's or a lawyer's conduct in the context of the entire case.  This is particularly true for sanctions coming at the end of a case.

To address this inherent limitation, I set forth the detailed basis for the sanctions amount I recommend in an Excel workbook appended as an addendum to this order.  This addendum is particularly helpful to the District Judge because it enables consideration of alternative factors when calculating sanctions.  Our electronic court filing system does not allow me to file the Excel workbook itself, but the record shall include both the PDF version of the workbook as the addendum as well as the interactive Excel workbook itself.

## II.

I do not need to recount in detail here the entire two-and-a-half-year history of this case to rule on the last pending motion.  If I did that, I would run the risk of bringing back some of the crowd noise.  Moreover, the pending motion follows the District Court's decision to grant an earlier motion for sanctions.  NPF has presented no reason, nor has shown through its conduct, why I should treat the pending motion any differently.

I instead start with the long-standing principle the SY Dawgs seek to avoid in one of the three ways I mentioned above.  That principle, a common feature of both federal law and Ohio law, is the American Rule regarding the recovery of attorney's fees.  "[A] prevailing party may not ordinarily recover attorneys fees in the absence of a statute or

enforceable contract providing for a fee award."[4]  I examine each of those three ways below.

   *Attorney's Fees and Costs Through the Court's Inherent Powers.*  The first way the SY Dawgs seek to sidestep the American Rule is through the Court's inherent powers. The Supreme Court has long acknowledged the inherent power of federal courts to sanction litigants for abusive conduct and bad faith litigation.

> Although the traditional American rule ordinarily disfavors the allowance of attorneys' fees in the absence of statutory or contractual authorization, federal courts, in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require. Indeed, the power to award such fees 'is part of the original authority of the chancellor to do equity in a particular situation' . . . and federal courts do not hesitate to exercise this inherent equitable power whenever 'overriding considerations indicate the need for such a recovery' . . . .

> Thus, it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons' . . . .  In this class of cases, the underlying rationale of 'fee shifting' is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of 'bad faith' on the part of the unsuccessful litigant.[5]

---

[4] *Shimman v. Int'l Union of Operating Engineers, Local 18*, 744 F.2d 1226, 1229 (6th Cir. 1984) (noting that the Supreme Court of the United States has reaffirmed the American Rule numerous times and citing *Hensley v. Eckerhart*, 461 U.S. 424 (1983), *Summit Valley Indus. Inc. v. Local 112, United Bhd. of Carpenters & Joiners of Am.*, 456 U.S. 717 (1982), and *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975)).  *See also Wilborn v. Bank One Corp.*, 2009-Ohio-306, 121 Ohio St. 3d 546, 906 N.E.2d 396, 400 (2009); *Nottingdale Homeowners' Ass'n, Inc. v. Darby*, 33 Ohio St. 3d 32, 33–34, 514 N.E.2d 702, 703–04 (1987); *State ex rel. Beebe v. Cowley*, 116 Ohio St. 377, 382, 156 N.E. 214, 216 (1927); *Sorin v. Bd. of Ed. of Warrensville Heights Sch. Dist.*, 46 Ohio St. 2d 177, 179, 347 N.E.2d 527, 528–29 (1976).

[5] *Hall v. Cole*, 412 U.S. 1, 4-5 (1973) (internal citations omitted).  *See also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991).

Ohio law has the same exception to the American Rule "when the prevailing party demonstrates bad faith on the part of the unsuccessful litigant."[6]

Whether under federal law or Ohio law, this is not a power to be taken lightly. After all, it runs counter to the American Rule that has since 1796[7] called for litigants to pay their own litigation costs and expenses. Without limitations, this inherent power would swallow up the rule. Accordingly, the courts have set a high bar for triggering this power. The required showing includes such instances where a party has maintained a defense " 'in bad faith, vexatiously, wantonly, or for oppressive reasons,' "[8] where there has been "abuse of the judicial process,"[9] or "where a meritless claim or defense is maintained in bad faith."[10] Our Circuit has consistently upheld this high bar. "In order to award attorneys' fees under this bad faith exception, a district court must find that 'the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment.' "[11]

This case and so many like it illustrate the difficulty we have in defining bad faith. What one side believes is bad faith litigation is to the other side merely aggressive litigation tactics—that sometimes help to achieve the client's objective. And who doesn't want an

---

[6] *Wilborn*, 906 N.E.2d at 400 (citing *Pegan v. Crawmer*, 79 Ohio St. 3d 155, 156, 679 N.E.2d 1129, 1129-30 (1997)).

[7] *Arcambel v. Wiseman*, 3 U.S. (3 Dall.) 306, 1 L. Ed. 613 (1796).

[8] *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 n.4 (1968) (quoting 6 MOORE'S FEDERAL PRACTICE 1352 (1966 ed.)).

[9] *Shimman*, 744 F.2d at 1230. *See also Shimman, id.*, n.5 (collecting cases).

[10] *Shimman*, 744 F.2d at 1230 (footnote collecting cases omitted)

[11] *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313 (6th Cir. 1997) (quoting *Smith v. Detroit Fed'n of Teachers Local 231, Am. Fed'n of Teachers, AFL-CIO*, 829 F.2d 1370, 1375 (6th Cir. 1987), and citing *Hall*, 412 U.S. at 5).

aggressive lawyer on their side? But the bad faith exception requires me to make "actual findings of fact that demonstrate that the claims were meritless, that counsel knew or should have known that the claims were meritless, and that the claims were pursued for an improper purpose."[12]

NPF tried to strike first by asking for injunctive relief. I denied that request over two years ago,[13] NPF did not object, and the District Court adopted my report and recommendation.[14] Rational thinking might have led a client to conclude it was then time to end this litigation. To that rational-thinking client, the subsequent litigation strategy did not benefit NPF. NPF went on to amend its complaint twice,[15] but was never successful in getting injunctive relief. It even went to the trouble of asking the Court of Appeals to intervene on a writ of mandamus,[16] only to have everything end with NPF voluntarily dismissing its case with prejudice.[17] None of that appears to have pushed the ball forward for NPF.

But was that litigating in bad faith? If it was, then NPF owes the SY Dawgs the entire bill associated with their defense of this case, or $445,666.91 with post-judgment interest to accrue at an annual rate of 0.1280% compounded annually.[18] This number

---

[12] *Big Yank Corp.*, 125 F.3d at 314 (citing *Smith*, 829 F.2d at 1375).
[13] ECF #48.
[14] ECF #51.
[15] ECF #14, 54.
[16] ECF #194.
[17] ECF #211.
[18] 28 U.S.C. § 1961(a) and (b). Given this statutory language, the interest rate would vary slightly depending on the date the judgment under this theory of relief is entered. The website address where the appropriate future rate can be found is on tab 4 of the addendum

constitutes the total fees and costs the SY Dawgs spent on this litigation, as set forth in the exhibit they submitted for purposes of the oral argument on their pending motion[19] and as reflected in the addendum to this order.

But if that's the case, don't we run the risk of undermining the American Rule? After all, who wouldn't say from the SY Dawgs' perspective that these aggressive tactics were a pointless waste of resources, punctuated by NPF's decision to walk away from it all after two and a half years of contentious litigation? Even its decision to dismiss the case voluntarily with prejudice came with a robust flourish.  Just within the three-and-a-half-month period culminating in the voluntary dismissal of this case, NPF filed an interlocutory appeal,[20] voluntarily dismissed it,[21] filed a petition for a writ of mandamus and a motion to stay[22] both of which it lost,[23] a motion for a default judgment against the SY Dawgs,[24] a motion for leave to file a motion for summary judgment,[25] and then its motion to dismiss its lawsuit with prejudice.[26]  Our rational-thinking client might conclude that NPF couldn't make up its mind—and wasted plenty of time and money for both sides along the way.

Perhaps.  Or like a scrappy softball team that's up to bat at the bottom of the ninth facing a significant deficit of, say, 7 to 0, NPF decided not to give up for fear of setting a

---

("1-Year TBill Constant Weekly").  I explain these calculations in the last part of this report and recommendation.

[19] ECF #235, Exh. 23.

[20] ECF #174.

[21] ECF #181.

[22] ECF #180.

[23] ECF #194.

[24] ECF #187.

[25] ECF #207.

[26] ECF #211.

bad precedent when facing future rivals.  It instead chose to throw everything it had into that last half inning of play.  No one would accuse that team of bad faith.  Some might even praise it for having given its all even when the chips were down.  That's why the bar is set so high for bad faith.

Moreover, this case didn't appear to start out with NPF asserting meritless claims. Its original complaint pled five causes of action alleging: breaches of a 67-page Franchise Agreement[27] that covered all the nuts and bolts you would expect in a national professional sports league; breaches of a six-page Non-Disclosure and Non-Competition Agreement[28] that was designed to protect the integrity of the league and the product on the field; tortious interference with a multi-million dollar business; and fraudulent misrepresentations related to the SY Dawgs' plan to leave the league.

When NPF amended the complaint once to add one new defendant[29] and then twice to add three new defendants and one new cause of action,[30] one might have started to wonder whether NPF was maintaining its lawsuit in bad faith.  The problem with this argument is that it overlaps with the period when discovery disputes started to arise, which plainly overshadowed everything else.

NPF's own filing suggests the reason why it maintained the lawsuit as it did.  In the motion it filed in July 2019 to dismiss its lawsuit with prejudice, NPF explained that even if it were to obtain injunctive relief—which seemed extraordinarily remote at that point—

---

[27] ECF #1-1.
[28] ECF #1-2.
[29] ECF #14.
[30] ECF #54.

the Non-Disclosure and Non-Competition Agreement had only a two-year covenant not to compete.  Since the SY Dawgs had withdrawn from the league in January 2018, NPF could restrain them only until January 2020.[31]

Does that mean NPF abused the judicial process[32] or maintained a meritless claim in bad faith?[33]  Perhaps, but the record does not suggest one clear answer sufficient to trigger the shifting of fees and costs to NPF.  NPF's claims to protect the league it had built never seemed particularly frivolous even if it was unsuccessful in proving them.  As I cautioned above, we run the risk of swallowing up the American Rule with this exception if we were to equate bad faith with failed litigation.  If NPF could be accused of intentional foot dragging, it did so through intentional delays in discovery—which leads us to the third ground for relief addressed below.

Based on the foregoing, it is my recommendation that this theory is not the best fit for this case.  I make this recommendation with the limitations I mentioned above, namely, that I was not present for all of the proceedings in this case where NPF's misconduct occurred or was at issue.  I also was not a part of all earlier decisions regarding NPF's misconduct.  Should the District Judge decide this theory is an appropriate basis for deciding the pending motion, then NPF owes the SY Dawgs $445,666.91 with post-judgment interest at an annual rate of 0.1280% compounded annually.  Should the District Judge decide this theory is appropriate but NPF's conduct was not so egregious as to

---

[31] ECF #211, at 3.  *See also* ECF #238, at 36.
[32] *Shimman*, 744 F.2d at 1230.
[33] *Id.*

warrant shifting the entire defense expense,[34] then it is my recommendation that the sanctions amount be tailored to NPF's bad faith conduct. The addendum provides an interactive calculator under tab 1 of the Excel workbook ("Exh. 23--without formulas shown") that allows a specific percentage of the entire defense expense to be quickly calculated.

***Attorney's Fee and Costs Through a Contract Provision.*** The SY Dawgs' next avenue for requesting sanctions is a contract provision in the Non-Disclosure and Non-Competition Agreement the parties entered into on October 22, 2015.[35] My focus now shifts to Ohio law, which the parties designated as the governing law for this agreement.[36] Deciding under Ohio law whether NPF is contractually obligated to pay the SY Dawgs' attorney's fees and litigation costs requires consideration of the language in paragraph 14 of the Non-Disclosure and Non-Competition Agreement and the language in the District Court's order of July 18, 2019 granting NPF's motion to dismiss its lawsuit with prejudice.

The contract clause in question provides:

14. Attorneys' Fees. In any action at law or in equity to enforce any of the provisions or rights under this Agreement, the unsuccessful party in such litigation, as determined by the court in a final judgment or decree, shall pay the successful party or parties all costs, expenses and reasonable attorneys' fees incurred therein by such party or parties (including without limitation such costs, expenses and fees on any appeals), and if such successful party shall recover judgment in

---

[34] *See*, *e.g.*, *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 509–10 (6th Cir. 2002) (affirming district court's use of inherent powers to award 98% of attorney's fees).
[35] ECF #212-1.
[36] *Id.*, ¶ 11.

> any such action or proceeding, such costs, expenses and attorneys' fees shall be included as part of such judgment.[37]

NPF alleged in all of its complaints a breach of this agreement.[38]  No one disputes the validity of this clause or the agreement.

The District Court's order is straightforward enough.  It reads:

> Plaintiff has moved to voluntarily dismiss this action with prejudice. (ECF #211). Plaintiff's Motion to Voluntarily Dismiss this Action is GRANTED.  Accordingly, this action is DISMISSED WITH PREJUDICE.
>
> Defendants' [sic] have filed a Motion for Costs and Fees.  (ECF #212)  Plaintiff shall file a response to that motion by August 1, 2019. Defendants may file a reply by August 8, 2019.
>
> IT IS SO ORDERED.[39]

Ohio law recognizes the contract exception to the American Rule.  "Attorney fees may be awarded when … an enforceable contract specifically provides for the losing party to pay the prevailing party's attorney fees."[40]  Ohio courts view fee-shifting contract clauses as part of the parties' "fundamental right to contract freely with the expectation that the terms of the contract will be enforced."[41]

In the absence of any suggestion that NPF and the SY Dawgs were in an unequal bargaining position when they entered into the Non-Disclosure and Non-Competition

---

[37] ECF #212-1, at 5.

[38] ECF #1, at 8; ECF #14, at 9; ECF #54, at 11.

[39] ECF #213.  This was not the language NPF had requested in its motion to dismiss with prejudice.  It wanted the parties to bear their respective costs.  *See* ECF #211, at 1, 6.

[40] *Wilborn*, 906 N.E.2d at 400 (citing *Nottingdale Homeowners' Assn.*, 33 Ohio St. 3d at 34, 514 N.E.2d at 704-05).

[41] *Nottingdale Homeowners' Ass'n, Inc.*, 514 N.E.2d at 705.

Agreement or that there was compulsion or duress, Ohio law upholds these types of contract provisions.  They are "enforceable and not void as against public policy so long as the fees awarded are fair, just and reasonable as determined by the trial court upon full consideration of all of the circumstances of the case."[42]

The first complication is the fact that the case ended with NPF's decision to dismiss its lawsuit voluntarily with prejudice rather than, say, by a verdict after a trial or an adjudication of a summary judgment motion.  A voluntary dismissal with prejudice is an adjudication on the merits under Ohio law.[43]  "[W]ithout an adjudication on the merits, no formal 'prevailing party' exists."[44]

But is an adjudication on the merits alone sufficient to declare one side or the other the prevailing one? And if so, how do we go about identifying the prevailing party? The second complication, therefore, is determining who the prevailing party is in this situation

A word of caution is in order.  Much of Ohio case law governing the intersection of the three principles of recovery of attorney's fees, prevailing party, and voluntary dismissal with prejudice revolves around statutes, not contract language.  The statutory exception to the American Rule, however, is different from the contract exception, even though both

---

[42] *Id.*, 514 N.E.2d at 703.

[43] *Tower City Properties v. Cuyahoga Cty. Bd. of Revision*, 49 Ohio St. 3d 67, 551 N.E.2d 122, 124 (1990); *Fletcher v. Univ. Hosps. of Cleveland*, 2008-Ohio-5379, 120 Ohio St. 3d 167, 897 N.E.2d 147, 150 (2008) (citing *Thomas v. Freeman*, 79 Ohio St. 3d 221, 225, 680 N.E.2d 997, 1001 n.2 (1997)).

[44] *Miami Valley Hosp. v. Payson*, 2001-Ohio-1926, 2001 WL 1562103, at *4 (2001) (citing *Sturm v. Sturm*, 63 Ohio St. 3d 671, 675, 590 N.E.2d 1214, 1217 (1992)); *Champion Mall Corp. v. Bilbo Freight Lines, Inc.*, 81 Ohio App. 3d 611, 611 N.E.2d 969, 971 (1992) (citing *Sturm*, 590 N.E.2d at 1217 (citing *Hensley v. Henry*, 61 Ohio St. 2d 277, 279, 400 N.E.2d 1352, 1353 (1980))).

allow for fee shifting. The two exceptions should not be confused, because statutes can carry their own unique language, requirements, and interpretations before attorney's fees can be award.[45]

The same caution applies to federal case law. Federal law does not govern the parties' agreement here. Though perhaps helpful by analogy, cases expounding on federal law even from this federal District or Circuit[46] are not dispositive of the contract interpretation I must undertake.

With this caveat in mind, Ohio law suggests that having an adjudication on the merits is a necessary condition for determining whether there is a prevailing party but not always a sufficient condition.[47] This makes sense, because many cases that settle end with

---

[45] *See, e.g., Winona Holdings, Inc. v. Duffey*, 2014-Ohio-519, 2014 WL 585969, at *5 (2014) (defining "prevailing party" for purposes of Ohio Rev. Code Ann. § 2307.61(B) (West) as requiring the party to prevail on the merits before attorney's fees can be awarded). *See also Farrar v. Hobby*, 506 U.S. 103, 111 (1992) (defining "prevailing party" for purposes of 42 U.S.C. § 1988).

[46] *See, e.g., Lum v. Mercedes Benz, USA, L.L.C.*, 246 F.R.D. 544 (N.D. Ohio 2007) (finding that defendant was not entitled to an award of costs as a prevailing party under Fed. R. Civ. P. 41(a)(2) or 54(d) and finding no exceptional circumstances to justify attorney's fees where plaintiff dismissed case with prejudice); *Dorsey v. Commonwealth Land Title Ins. Co.*, No. 1:08-CV-1103, 2008 WL 5071894, at *4 (N.D. Ohio Nov. 24, 2008) (refusing to award attorney's fees under Fed. R. Civ. P. 41(a)(2), but granting attorney's fees and costs pursuant to Fed. R. Civ. P. 37(d) where plaintiff dismissed her case with prejudice*); Juric v. Eminger Enterprises LLC*, No. 1:16 CV 0366, 2018 WL 3993814, at *2 (N.D. Ohio Aug. 21, 2018) (finding defendant was not a prevailing party under Fed. R. Civ. P. 54 and finding no exceptional circumstances to justify an award of attorney's fees under Fed. R. Civ. P. 41 where plaintiff dismissed his case with prejudice).

[47] *See, e.g., State ex rel. Dillard Dept. Stores v. Ryan*, 2009-Ohio-2683, 122 Ohio St. 3d 241, 910 N.E.2d 438, 441 (2009) (affirming a court of appeals in deciding that a self-insured employer who pays a significant sum of money to settle a workers' compensation claim is not a prevailing party where the case was voluntarily dismissed with prejudice). *See also Moldovan v. Lear Siegler, Inc.*, No. C.A. 92CA005375, 1993 WL 46656, at *3 (Ohio Ct. App. Feb. 24, 1993) (holding that voluntarily dismissal with prejudice serves as

a voluntary dismissal with prejudice.  Sometimes, we can easily identify the prevailing party (*e.g.*, a doctor settles a medical malpractice lawsuit for $1 million, and the injured patient voluntarily dismisses the case with prejudice).  Sometimes not (*e.g.*, two big pharmaceutical companies engaged in an antitrust lawsuit settle by entering into a joint venture agreement on a new vaccine where they will split the profits, and the plaintiff voluntarily dismisses the case with prejudice).  In other words, all orders granting a plaintiff's motion to voluntarily dismiss a case with prejudice are not necessarily created equal, even though they may contain identical or nearly identical language.  Thus, the language in the dismissal entry can at times be important in sorting out who the prevailing party is.[48]

We then move to the next question: how do we go about identifying the prevailing party? The parties agreed at oral argument that "prevailing" is equivalent to "successful," that these terms are unambiguous, and that I can answer this question as a matter of law.[49]

---

an adjudication on the merits but does not mean the issues have been "actually litigated" as required for issue preclusion) (citing *Gargallo v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 918 F.2d 658, 664 (6th Cir. 1990)); *State ex rel. Kostoff v. Beck Energy Corp.*, 2019-Ohio-1221, 134 N.E.3d 775, 779, *appeal not allowed*, 2019-Ohio-2780, 156 Ohio St. 3d 1455, 125 N.E.3d 945 (2019) (same).  *Cf. Merino v. Salem Hunting Club*, 2012-Ohio-4553, 2012 WL 4712362, at *3 (2012) ("a voluntary dismissal pursuant to Civ. R. 41(A) does not adjudicate the merits of a claim, does not produce a prevailing party, and does not end in a final appealable order") (citation omitted).

[48] *See State ex rel. Dillard Dept. Stores*, 910 N.E.2d at 442 (holding that voluntary dismissal with prejudice entry was insufficient and that self-insured employer needed to obtain a final judicial determination to be eligible for surplus-fund reimbursement).

[49] ECF #238, at 8-9.

Counsel were correct on Ohio law.[50]  Defining "prevailing" (or "successful") party under Ohio law, though, is still tricky.

Some Ohio courts have turned to legal dictionaries to define "prevailing party." "Black's Law Dictionary (9th ed. 2009) defines 'prevailing party' as '[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded <in certain cases, the court will award attorney's fees to the prevailing party>. —Also termed *successful party*.' "[51]  The online version of Black's Law Dictionary defines "prevailing party" as follows: "That one of the parties to a suit who successfully prosecutes the action or successfully defends against It [sic], prevailing on the main issue, though not to the extent of his original contention."[52]

Some Ohio courts have looked to the common law for a definition of "prevailing party," sometimes borrowing a definition from another jurisdiction.  In one case where the plaintiff dismissed her case with prejudice because she had settled in her favor and the judgment so reflected that fact, the court found the plaintiff to be the prevailing party under

---

[50] *See*, *e.g.*, *Hikmet v. Turkoglu*, 2009-Ohio-6477, 2009 WL 4699101, at *14 (2009) (affirming decision to determine who was a "prevailing party" as a matter of law); *EAC Properties, L.L.C v. Brightwell*, 2014-Ohio-2078, 2014 WL 2048191, at *9 (2014) ("[t]he interpretation of a written contract . . . is a question of law" and "[a]bsent ambiguity in the language of the contract, the parties' intent must be determined from the plain language of the document") (citations omitted); *Stonehenge Land Co. v. Beazer Homes Invest., L.L.C.*, 177 Ohio App. 3d 7, 20, 893 N.E.2d 855, 864 (2008) ("[t]he question of whether a contract is ambiguous is a question of law") (citations omitted); *Woodside Mgmt. Company v. Bruex*, 2020-Ohio-4039, 2020 WL 4669430, at *26 (2020) ("[t]he interpretation of a contract is a matter of law") (citation omitted).

[51] *Hikmet*, 2009 WL 4699101, at *14 (emphasis in original).

[52] *See* https://thelawdictionary.org/prevailing-party/ (citing *Belding v. Conklin*, 2 Code Rep. 112 (1849); *Weston v. Cushing*, 45 Vt. 531 (1868); *Hawkins v. Nowland*, 53 Mo. 328, 329 (1873); *Pomroy v. Cates*, 81 Me. 377, 17 A. 311 (1889)), last accessed 9/17/20.

the following definition: " '[t]he one in whose favor the decision or verdict is rendered and judgment entered.' "[53]

Some Ohio courts have borrowed definitions from Ohio appellate courts from around the state.  For example, the Ninth District Court of Appeals borrowed this definition from the Eleventh District Court of Appeals in deciding that a party prevailed after a jury had awarded him damages even though those damages were less than his settlement demand:

> The party to a suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not necessarily to the extent of his original contention.  The one in whose favor the decision or verdict is rendered and judgment entered. * * * This may be the party prevailing in interest, and not necessarily the prevailing person.  To be such does not depend upon the degree of success at different stages of the suit, but whether, at the end of the suit, or other proceeding, the party who had made a claim against the other, has successfully maintained it.[54]

Some Ohio courts have borrowed language from the Supreme Court of the United States.  "The United States Supreme Court has defined a 'prevailing party' as one who has

---

[53] *Yetzer v. Henderson*, No. 1967, 1981 WL 6293, at *2 (Ohio Ct. App. June 4, 1981) (quoting *United States v. Minneapolis, St. P. & S. S. M. Ry. Co.*, 235 F. 951, 955 (D. Minn. 1916)).  *See also Hagemeyer v. Sadowski*, 86 Ohio App. 3d 563, 621 N.E.2d 707, 709 (1993) (examining the meaning of "prevailing party" under Ohio Civ. R. 54(D), and rejecting an argument that a party was the prevailing one despite having settled the case where the judgment simply recognized that the parties had entered into a settlement agreement and dismissed the case with prejudice).

[54] *Moga v. Crawford*, 2008–Ohio–2155, 2008 WL 1961216, at *2 (2008) (quoting *Lehto v. Sankey*, No. 99-T-0137, 2001 WL 735898, at *7 (Ohio Ct. App.. June 29, 2001), and *Woodfork v. Jones*, No. 15841, 1997 WL 71820, at *6 (Ohio Ct. App. Feb. 21, 1997)).  *See also Leaman v. Coles*, 115 Ohio App. 3d 627, 685 N.E.2d 1294, 1297 (1996) (same).

16

been awarded at least some relief on the merits of his claims."[55]

And for some Ohio courts, the definition appears to be driven by the specific facts of the case.  The Supreme Court of Ohio, for example, has said that a party is not the prevailing one under Ohio Civ. R. 54 where the plaintiff won an arbitration award of $10,000, challenged it at trial, and was awarded $5,000 by a jury.[56]  On this same logic, one Ohio appellate court held that "[a] "prevailing party" is one in whose favor the decision or verdict is rendered and judgment entered."[57]  Using this definition, the court held that a tenant obtained "some relief" when he successfully defended against a claim for forcible entry and detainer and where the judgment entered in his favor allowed him to retain possession of the premises.  This would have allowed the tenant to receive attorney's fees under the old lease.  The court held, however, that the tenant forfeited the prevailing party status when he entered into a new lease.[58]

Ohio courts have also dealt with split judgments where the plaintiff wins by verdict on some but not all of its claims.  In that situation where a fee-shifting provision in a commercial lease was in play, one Ohio court held that, because the tenant won on the "main issue," it was the prevailing party.[59]

---

[55] *Falther v. Toney*, 2005-Ohio-5954, 2005 WL 2995161, at *4 (2005) (citing *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 603–04 (2001) (quoting *Hewitt v. Helms*, 482 U.S. 755, 760 (1987))).

[56] *Vance v. Roedersheimer*, 64 Ohio St. 3d 552, 597 N.E.2d 153, 156 (1992) ("[a] party who goes into such a trial with an award of $10,000 and emerges with $5,000 can hardly be said to have prevailed").

[57] *Keal v. Day*, 164 Ohio App. 3d 21, 840 N.E.2d 1139, 1141 (2005).

[58] *Id.*, 840 N.E.2d  at 1142.

[59] *Simbo Properties, Inc. v. M8 Realty, L.L.C.*, 2019-Ohio-4361, 149 N.E.3d 941, 954 (2019), *appeal not allowed*, 2020-Ohio-877, 158 Ohio St. 3d 1437, 141 N.E.3d 255,

Who wouldn't say that NPF didn't win this fight—at least the main issue of injunctive relief?  After two and a half years of litigation, NPF's track record looked like this: never got the temporary restraining order it had sought in its three complaints;[60] lost a preliminary injunction motion[61] and a petition for a writ of mandamus;[62] was compelled twice to produce discovery;[63] and was sanctioned for non-compliance with a court order.[64] NPF has a pretty high number in the loss column, and not much to show in the win column.

The Supreme Court of Ohio has held that a voluntary dismissal with prejudice is an adjudication of the case on its merits.  NPF can't bring its claims again against the SY Dawgs.  And it walked away with nothing.  In that sense, the SY Dawgs won the litigation, and are entitled to reimbursement for the full amount of their litigation fees and expenses.  If the SY Dawgs prevailed as it seems, then NPF promised in its contract with them and Joel Bartsch that it would reimburse "all costs, expenses and reasonable attorneys' fees."[65]

But does this really mean then that the SY Dawgs prevailed? Certainly from the SY Dawgs' perspective.  But it's not so clear from the law's perspective.  A caution is again in order: we must not let the crowd noise drown out more level-headed thinking.  To return

---

*reconsideration denied,* 2020-Ohio-2819, 158 Ohio St. 3d 1508, 144 N.E.3d 458 (2020). *See also EAC Properties, L.L.C.,* 2014 WL 2048191, at *4 (applying same "main issue" doctrine); *Hustler Cincinnati, Inc. v. Elm 411, LLC,* 2014-Ohio-5648, 2014 WL 7339031, at *3 (2014) ("a party may be a prevailing party for fee-shifting purposes even if he obtains only some of the relief originally sought").

[60] ECF #1, 14, 54.
[61] ECF #51.
[62] ECF #194.
[63] ECF #111, 151.
[64] ECF #171.
[65] ECF #212-1, at 5.

to our softball game, this litigation is like Team A challenging Team B to a grudge match. For nine innings, each team throws their best pitchers and batters against each other.  When someone gets on base, the next batter hits into a double play.  When a batter finally gets a good crack at the bat, the outfielder makes an amazing, well-timed leap and catches the ball before it can clear the fence.  By the end of nine innings, each team is spent—and the score is tied, 0 to 0.  Would we say that anyone prevailed? We would be tempted to say, well, it depends.  That's why the law is the way it is.

Determining the prevailing party is plainly a challenging proposition under Ohio law.  And the analysis doesn't end there.  I must still apply this law to paragraph 14 of the parties' Non-Disclosure and Non-Competition Agreement to determine whether its requirements are met to shift the SY Dawgs' fees and costs to NPF.  "Absent ambiguity in the language of the contract, the parties' intent to award fees only to prevailing parties must be determined from the plain language of the document."[66]  To do that, I must consider the language of the fee-shifting provision as well as the language of the dismissal order.

The fee-shifting provision qualifies the unsuccessful party in the litigation with the clause "as determined by the court in a final judgment or decree."[67]  The order granting NPF's motion to dismiss its lawsuit against the SY Dawgs with prejudice contains no such determination.  Albeit not identical to a voluntary dismissal in state court, NPF's dismissal with prejudice comes close to having "[t]he distinctive feature . . . that it is a self-executing

---

[66] *Hustler Cincinnati, Inc.*, 2014 WL 7339031, at *3 (citation omitted).
[67] ECF #212-1, at 5.

act of a party undertaken without judicial intervention."[68] Its motion resulted in the type of short, straightforward order we would anticipate from NPF's decision to terminate its lawsuit. Paragraph 14 of the parties' agreement requires more before fees are shifted, however. It requires at least a level of judicial intervention sufficient to determine who the unsuccessful party is. That didn't happen here.

Based on the foregoing, it is my recommendation that this theory to recover costs, expenses, and reasonable attorney's fees is not the best fit for this case. Like my recommendation under the first theory, this recommendation is a close call. Under Ohio law, an order granting a voluntary dismissal with prejudice is an adjudication on the merits of the case. For some courts in our state, that may be sufficient to determine the prevailing party, depending on the way they interpret "prevailing party." But even if that hurdle is cleared, NPF's dismissal with prejudice has many of the features of a self-executing act. Granting NPF's motion required court approval to be sure,[69] but paragraph 14 of the parties' agreement requires the court in effect to declare the loser. The order granting NPF's motion didn't do that.

While it is easy to understand the defense's frustration that NPF dismissed its lawsuit in an effort "to simply walk away from the harm it has caused in this case and its abuse of the judicial system,"[70] that frustration cannot change the law. It is better addressed in the third ground for relief which I take up next.

---

[68] *Howard v. Schutte*, No. 14714, 1995 WL 92268, at *2 (Ohio Ct. App. Feb. 17, 1995).
[69] Fed. R. Civ. P. 41(a)(2). *Compare* Ohio Civ. R. 41, which normally does not require a court order for voluntary dismissals.
[70] ECF #212, at 3.

*Attorney's Fees and Costs for Discovery Violations.*  The third ground the SY Dawgs argue for reimbursement of their attorney's fees and costs is Fed. R. Civ. P. 37. This rule authorizes the imposition of sanctions for a wide variety of misconduct, including a party's failure to attend its own deposition, to serve answers to interrogatories, or to respond to a request for inspection;[71] for failure to disclose or supplement an earlier response or to admit;[72] for failure to make disclosures or to cooperate in discovery or for giving evasive or incomplete disclosure, answers, or responses;[73] or for disobeying a court order to provide or permit discovery.[74]  As the potential abuses are wide-ranging, so too are the possible sanctions.

One example suffices to illustrate the breadth of sanctions authority.  The SY Dawgs have pointed to NPF's failure to appear for depositions.  Fed. R. Civ. P. 37(d) addresses this particular violation, and subsection (3) describes the possible sanctions.

> **(3)** *Types of Sanctions*.  Sanctions may include any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).  Instead of or in addition to these sanctions, the court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

The list of violations the SY Dawgs cite doesn't end here, but neither do the possible sanctions.  Sanctions authorized by Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi) range all the way to

---

[71] Fed. R. Civ. P. 37(d)
[72] Fed. R. Civ. P. 37(c).
[73] Fed. R. Civ. P. 37(a).
[74] Fed. R. Civ. P. 37(b).

dismissal of the case—a request the District Judge considered[75] from the SY Dawgs[76] and (as a default judgment) from NPF[77] in the last hearing before NPF voluntarily dismissed its case with prejudice.[78]

The Court of Appeals in turn reviews application of this broad authority under an abuse of discretion standard.[79]  That review involves the consideration of four factors.

> The first factor is whether the party's failure to cooperate in discovery is due to willfulness, bad faith, or fault; the second factor is whether the adversary was prejudiced by the party's failure to cooperate in discovery; the third factor is whether the party was warned that failure to cooperate could lead to the sanction; and the fourth factor in regard to a dismissal is whether less drastic sanctions were first imposed or considered.[80]

I do not start my analysis on a tabula rasa.  Below is a short history from the case docket of the SY Dawgs' efforts to obtain discovery sanctions against NPF.  The highlighted rows reflect those efforts.  The other entries provide some context.

| 2/2/18 | ECF #1 | Complaint for TRO, Preliminary Injunction, Money Damages and Other Relief |
| 2/10/18 | ECF #14 | Amended Complaint for TRO, Preliminary Injunction, Money Damages and Other Relief |

---

[75] ECF #195.

[76] ECF #178 and #182.

[77] ECF #187.

[78] ECF #211.

[79] *Freeland v. Amigo*, 103 F.3d 1271, 1276 (6th Cir. 1997) (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976)).  *See also Doe v. Lexington-Fayette Urban Cty. Gov't*, 407 F.3d 755, 761 (6th Cir. 2005) (reviewing award of attorney's fees on abuse of discretion standard) (citing *Purtle v. Eldridge Auto Sales, Inc.*, 91 F.3d 797, 799 (6th Cir. 1996)).

[80] *Freeland*, 103 F.3d at 1277 (citing *Reg'l Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 154–55 (6th Cir. 1988); *Bass v. Jostens, Inc.*, 71 F.3d 237, 241 (6th Cir. 1995); *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir. 1990)).

| | | |
|---|---|---|
| 2/26/18 | ECF #39 | Hearing on Motion for Preliminary Injunction |
| 5/29/18 | ECF #51 | <u>Order</u>: Report and Recommendation on Motion for Preliminary Injunction recommending motion be denied adopted without objection. |
| 6/6/18 | ECF #54 | Second Amended Complaint for TRO, Preliminary Injunction, Money Damages and Other Relief |
| 6/12/18 | ECF #59 | **Defendants' Motion for Attorney Fees, Costs and Expenses** |
| 8/9/18 | ECF #83 | <u>Order</u>: Report and Recommendation on Motion for Attorney Fees, Costs and Expenses recommending motion be denied without prejudice as premature adopted without objection. |
| 8/10/18 | ECF #84 | **Defendants' Motion for Costs and Fees Regarding Non-Attendance at Status Conference** |
| 8/24/18 | -- | <u>Order</u>: Plaintiff's Motion for Leave to File Notice of Withdrawal and Substitution of Counsel granted. |
| 9/14/18 | ECF #94 | **Defendants' Motion to Compel Discovery and Motion for Discovery Sanctions** |
| 10/10/18 | ECF #110 | <u>Order</u>: Defendants' Motion for Discovery Sanctions denied, "but may be re-visited as case proceeds." |
| 10/10/18 | ECF #111 | <u>Order</u>: Defendants' Motion to Compel Discovery granted "inasmuch as [plaintiff's] counsel has represented to Court & counsel that all requested information has been disclosed.  No sanctions at this time." |
| 10/25/18 | ECF #114 | **Defendants' Motion for Discovery Sanctions** |
| 12/28/18 | ECF #140 | Defendants' Motion to Compel Discovery |
| 12/28/18 | ECF #143 | Plaintiff's Motion to Compel Discovery and Motion for Discovery Sanctions |
| 1/25/19 | ECF #151 | <u>Order</u>: Plaintiff's Motion to Compel Discovery and Motion for Discovery Sanctions denied; Defendants' Motion to Compel Discovery granted; Defendants' Motion for Discovery Sanctions denied.  "The issue of sanctions may be revisited, if warranted, when the litigation of Plaintiff's claims has concluded." |
| 2/12/19 | ECF #161 | **Defendants' Motion for Sanctions and Notice of Non-Compliance with Court Order** |

| 3/15/19 | ECF #171 | Order: Defendants' Motion for Sanctions and Notice of Non-Compliance with Court Order granted, finding that "Plaintiff has failed to comply with the Court's January 25 Order" and further holding that "[f]ailure to comply with this Order will result in sanctions, up to including dismissal of Plaintiff's action."  "Again, any monetary sanctions for Plaintiff's repeated discovery intransigence will be addressed at the conclusion of this action." |
| --- | --- | --- |
| 3/21/19 | ECF #174 | Interlocutory Appeal by Plaintiff (COA Case No. 19-3235) |
| 3/25/19 | ECF #178 | **Defendants' Motion to Dismiss Case Pursuant to Fed. R. Civ. P. 37** |
| 3/27/19 | ECF #181 | Court of Appeals Order (issued on 3/26/19): Appellant's motion to Voluntarily Dismiss Appeal granted. |
| 3/27/19 | ECF #180 | Plaintiff's Petition for Writ of Mandamus (COA Case No. 19-3242) |
| 3/29/19 | ECF #182 | **Defendants' Second Motion to Dismiss Case Pursuant to Fed. R. Civ. P. 37** |
| 5/6/19 | ECF #187 | Plaintiff's Motion for Default Judgment |
| 5/22/19 | ECF #194 | Court of Appeals Order (issued on 5/21/19): Plaintiff's Petition for Writ of Mandamus denied. |
| 5/23/19 | ECF #195 | Hearing on Defendants' First and Second Motion to Dismiss and Plaintiff's Motion for Default Judgment |
| 6/19/19 | ECF #207 | Plaintiff's Motion for Leave to File Motion for Summary Judgment |
| 7/5/19 | ECF #211 | Plaintiff's Motion to Dismiss with Prejudice. |
| 7/12/19 | ECF #212 | **Defendants' Motion for Attorney Fees and Costs** |
| 7/18/19 | ECF #213 | Order: Plaintiff's Motion to Voluntarily Dismiss granted, reserving ruling on Defendants' Motion for Attorney Fees and Costs and scheduling the filing of Plaintiff's response and Defendants' reply to motion. |

NPF and its lawyers chose at their peril to adopt a tit-for-tat strategy, ignoring the

District Judge's clear warnings.  When the SY Dawgs filed a motion to compel,[81] NPF did

---

[81] ECF #140.

the same.[82]  When the SY Dawgs filed a motion to dismiss due to discovery abuses,[83] NPF followed suit.[84]

Even with the pending motion, the same pattern emerges.  When the SY Dawgs moved for attorney's fees and costs,[85] NPF didn't follow the District Judge's briefing schedule, which allowed for NPF's response to be followed by the SY Dawgs' reply.[86] Instead, NPF decided to make its own rules by filing later that day its "objections" to the SY Dawgs' motion and a new motion of its own, which it captioned a "request," to strike the SY Dawgs' motion pursuant to Fed. R. Civ. P. 12 and the Court's inherent authority.[87]

Thinking this was the opposition brief the District Judge had permitted, the SY Dawgs filed their reply brief as ordered.[88]  But NPF then filed another opposition brief later that day.[89]  In other words, it got two bites at the apple.  That, of course, put the SY Dawgs in a peculiar position of not having the last word on their motion, contrary to what the District Judge had ordered.  The SY Dawgs followed with their second reply brief.  They noted that NPF's second opposition brief was "procedurally improper," and acknowledged that their second reply brief was being filed on the assumption that the District Judge would allow NPF's second opposition brief.[90]  They alerted the District Judge that the parties were

---

[82] ECF #143.
[83] ECF #182.
[84] ECF #187.
[85] ECF #212.
[86] ECF #213.
[87] ECF #214.
[88] ECF #215.
[89] ECF #216.
[90] ECF #217, at 1 n.1.

not following the briefing schedule.  NPF made no such mention, apparently believing it could ignore the District Judge's order and set its own briefing schedule.

Roughly three weeks earlier, NPF filed a similar request to strike, this time complaining about the SY Dawgs' objections to its proposed findings of fact and conclusions of law.[91]  This request was neither opposed nor ruled on, because ten days later NPF filed its motion to dismiss with prejudice.[92]  Like the one that closely followed it, NPF's request appears to have been but an attempt to preserve a chance to have both the final word and two bites at the apple.  NPF wanted the Court to disallow the SY Dawgs' objections to NPF's proposed findings of fact and conclusions of law, but at the same time allow its own objections[93] to remain on the record.

This pattern of conduct is what got NPF crosswise with the District Judge in the first place.  The SY Dawgs' first motion for attorney's fees, costs, and expenses came in June 2018—only four months into the litigation.[94]  The District Judge adopted my report and recommendation, and denied the motion without prejudice as premature.[95]  The SY Dawgs' second sanctions motion regarding non-attendance at a status conference was prompted when no one appeared on NPF's behalf at the Court's status conference on August 9, 2018 despite proper notification.  That particular docket entry reflected the growing problems with discovery from NPF.  Besides documenting that no one had showed up on NPF's

---

[91] ECF #209.
[92] ECF #211.
[93] ECF #203, 204.
[94] ECF #59.
[95] ECF #83.

behalf, the entry noted that "Defendant has attempted to obtain discovery by issuing subpoenas, etc. No one has properly responded."[96]

About three weeks later, the District Judge permitted NPF to replace its lawyers. This could have been a chance for a fresh start, but it proved not to be so. Less than a month later, the SY Dawgs filed their third motion for sanctions and this time with a motion to compel discovery.[97] The District Judge denied the motion for discovery sanctions, noting: "but may be re-visited as case proceeds."[98] The District Judge, however, granted the motion to compel "inasmuch as [plaintiff's] counsel has represented to Court & counsel that all requested information has been disclosed. No sanctions at this time."[99]

The volume increased. Two weeks later, the SY Dawgs filed a fourth motion for sanctions[100] and two months after that a second motion to compel discovery.[101] As I noted above, NPF filed its own motion for discovery sanctions and to compel discovery later that day.[102] But any similarities between the parties' respective filings ended with the captions.

Less than a month later, the District Judge denied NPF's motion to compel discovery and its motion for discovery sanctions, finding "no reason to doubt Defendants' assurances to the Court that all responsive discovery has been provided"[103]; granted the SY Dawgs' motion to compel discovery; and denied the SY Dawgs' motion for discovery

---

[96] ECF #82.
[97] ECF #94.
[98] ECF #110.
[99] ECF #111.
[100] ECF #114.
[101] ECF #140.
[102] ECF #143.
[103] ECF #151, at 6.

sanctions, but again giving a warning. "The issue of sanctions may be revisited, if warranted, when the litigation of Plaintiff's claims has concluded."[104] The District Judge also found that the discovery the SY Dawgs sought "is relevant to the claims raised against Defendants and production will not [sic] unduly burdensome or expensive."[105]

When NPF failed to respond to the SY Dawgs' discovery requests within 14 days or to certify that it had fully responded to all of those requests and that there was nothing responsive left to produce, as the District Judge had ordered it to do, the SY Dawgs filed their fifth motion for sanctions.[106] The District Judge's patience was wearing thin. The motion was granted, and NPF was ordered to file an affidavit or declaration of its corporate representative certifying that NPF "has fully complied with the Defendants' discovery requests at issue by Friday, March 22, 2019. In addition, the Court also orders Plaintiff's counsel to file a similar certification of compliance by counsel on or before March 22, 2019. Failure to comply with this Order will result in sanctions, up to including dismissal of Plaintiff's action."[107] The parties were also directed to file an agreed upon protective order by March 22, 2019. Another warning to NPF came with this order. "Again, any monetary sanctions for Plaintiff's repeated discovery intransigence will be addressed at the conclusion of this action."[108]

The breadth of NPF's discovery violations was laid bare during the hearing the

---

[104] *Id.*
[105] *Id.* at 5.
[106] ECF #161.
[107] ECF #171, at 2.
[108] *Id.* at 2-3.

District Judge held on May 23, 2019 on NPF's motion for default judgment[109] and the SY

Dawgs' two motions to dismiss.[110]  In defense counsel's words:

> There was a belief at that time [May 29, 2018 when the District Judge adopted my report and recommendation that the motion for a preliminary injunction be denied] that the case would be dismissed, certainly among the Defendant and I think perhaps by the Court. When it became clear that that was not the case, the Defendant sent out written discovery.  They sent out subpoenas to the Plaintiff's parent company for documents, and they requested depositions of the corporate reps of those two entities.

> In eleven months since then, the Plaintiff has failed to answer virtually every interrogatory.  They have failed to provide responses to virtually every request, and their parent -- their parent has failed to provide documents in response to the subpoena, and both they and their counsel have twice failed to appear for subpoenaed and noticed depositions.[111]

Defense counsel provided another summary of NPF's transgressions later in the

hearing.

> We asked for their by-laws and their minute meetings from when our team left the league.  Those documents are relevant and responsive.  What does the league say internally about our departure? No production.  We have asked for their bank statements.  Have their financial accounts changed since we left the league? We know they have bank accounts.  We've seen them from before the preliminary injunction.  We asked for them since.  No production, not one.  We asked for the parents' financial records.  No production.[112]

Similar problems were recounted with regard to the scheduling of depositions.

> We have documented over a dozen instances where we attempted to cooperate with the Plaintiff's counsel to secure dates.  I've never had a party simply not show up for a deposition.  I have certainly never

---

[109] ECF #187.
[110] ECF #178, 182.
[111] ECF #197, at 4.
[112] *Id.* at 34.

had it twice but in this case, despite requests ahead of time, to set those up, despite the serving of notices and subpoenas in plenty of time, despite saying these dates don't work we will pick a different date, despite saying the location doesn't work we will pick a different location.[113]

That hearing also revealed a concern that NPF may have misrepresented in its filings

with the Court of Appeals what discovery was still to be completed.

> THE COURT: Let me ask you this, Mr. Allen [NPF's lawyer]: How do you represent to the Court of Appeals that you have thousands of documents that may be subject to relevance objections or attorney-client privilege or some other privilege, and yet, you come here and say that you turned everything over.
>
> MR. ALLEN: And your Honor, there is potentially thousands of documents. It was the statement in there, and that was when NPF was going back and reviewing its records to determine what was there, and so the arguments we made in the Sixth Circuit are the arguments we made in the Sixth Circuit, and we have certified now that absent further discovery from Defendants we have produced all responsive documents. It was a potential, and it was based on the wide breadth of your Honor's orders.
>
> THE COURT: Okay.[114]

The District Court's frustration came through loud and clear.

> THE COURT: But you are missing my point. You made a representation that you did turn over everything. Without getting into the weeds on the particular issues and the motion to compel and the response, you said that we complied, didn't you?
>
> MR. ALLEN: We said we complied to the best of our abilities at this time, yes, your Honor.
>
> THE COURT: I am not sure you said to the best of your abilities, but even when the defense comes back and says, no, you didn't and are finally exhausted in looking at all this, we said, look, I don't know what to do on this, and so I tell you you have to have a certification so there is somebody accountable for this; to say that you complied with all of their discovery requests and you say okay, and so the date on the certification comes and goes with no certification, what does that

---

[113] *Id.* at 8.
[114] *Id.* at 34-35.

mean? You know, again, if I don't follow my own orders, what kind of a judge am I, right?[115]

That same frustration came through moments earlier in the hearing.

> THE COURT: …
> I mean, I wasn't an English major in college, but if I read that paragraph, it sounds like when you say that you complied with all the discovery requests, that wasn't true.[116]

The District Court has already found discovery violations, and neither the parties nor the record gives me any reason to believe the District Court feels differently today about these violations than it did earlier.  The sentiment is likely worse because NPF doesn't seem to have gotten the message.

For example, instead of challenging the calculation of attorney's fees and costs the SY Dawgs presented to me on July 13, 2020, NPF went for broke by arguing it owed nothing.[117]  That was NPF's strategy even after both the District Judge[118] and I[119] had urged the parties to try to resolve the matter—if not as to the claims in the case, then at least as to the attorney's fees and costs that were the subject the SY Dawgs' prior motions including the pending one.  NPF refused to budge, claiming instead that the SY Dawgs refused to "provide either invoices or itemized time entries to substantiate the specific tasks that were performed, as well as the identity (and corresponding hourly rate) of the attorney who performed each specific task."[120]  This excuse turned out to be nothing more than a

---

[115] *Id.* at 40-41.
[116] *Id.* at 37.
[117] *See*, *e.g.*, ECF #238, at 5-6, 7, 22, 33, 36.
[118] ECF #197, at 42-43.
[119] ECF #219, 224, 226, 230.
[120] ECF #223, at 1.

subterfuge. When the SY Dawgs provided that information and more, nothing changed in NPF's strategy or behavior.[121]

This strategy ignores what the District Court already said multiple times about NPF's discovery violations and warnings about sanctions possibly being considered at the end of the case. By taking this hardline position, NPF only hurt itself. It missed an opportunity to challenge the expense and fee submissions the SY Dawgs presented to me—82 pages of itemized invoices from February 5, 2018 through June 26, 2020[122] and an Excel spreadsheet reflecting the same.[123] It had done something similar before when it asked the District Judge on May 23, 2019 for an opportunity to brief a sanction short of dismissal,[124] but then submitted no such briefing[125]—perhaps because to do so would have required NPF to alter its hardline stance on the appropriateness of any sanction at all. NPF also continued to insist at the oral argument that it had produced all requested materials except privileged ones—even though neither a privilege log was ever submitted to me nor a protective order ever sought.[126]

NPF used this same strategy in its written oppositions to the pending motion.[127] In its second brief in opposition, it claimed it had "complied with the Court's orders and has acted in good faith,"[128] despite the District Judge's comments to the contrary only a couple

---

[121] ECF #233, at 1.
[122] ECF #235, Exh. 25.
[123] ECF #235, Exh. 23.
[124] ECF #197, at 42.
[125] ECF #208, at 12.
[126] ECF #238, at 14-16, 18.
[127] *See*, *e.g.*, ECF #216, at 4, 6, 12.
[128] *Id.* at 13.

of months earlier[129] and the order granting sanctions only about four months earlier.[130] NPF's first brief in opposition asks that the pending motion be stricken from the record because attached exhibits contained information on settlement negotiations.[131] This is a baseless concern in light of the language of Fed. R. Evid. 408 on which NPF brought its motion to strike. Rule 408 governs the admissibility of compromise offers and negotiations to prove or disprove the validity or amount of a disputed claim or to impeach. These concerns underlying the rule, however, no longer apply here because NPF dismissed its case with prejudice.[132] This case will never go to trial. No one will ever need to prove or disprove in a courtroom the validity or amount of any claim that has been dismissed. NPF's strategy was to swing for the fence, but it came up short—significantly so.

This situation is like the ump telling the runner she ran outside the base path trying to avoid a tag while running home and is consequently out.[133] The runner can bob and

---

[129] ECF #197, at 40-41.

[130] ECF #171.

[131] ECF #214.

[132] *See*, *e.g.*, *Appalachian Reg'l Healthcare, Inc. v. U.S. Nursing Corp.*, No. 19-5031, 2020 WL 4814117, at *10 (6th Cir. Aug. 19, 2020) (holding that Fed. R. Evid. 408 "explicitly permits courts to admit [assessments of a claim's potential value or a party's potential exposure] for purposes other than to address the validity or amount of a claim"); *Bolson Materials Int'l Corp. v. 3D Sys. Corp.*, 746 F. App'x 445, 452 (6th Cir. 2018) (in discussing inadmissibility of settlement offers, holding that such evidence is admissible for certain purposes such as showing a party fraudulently induced a settlement).

[133] *See* https://www.wusa.org/page/show/487116-what-is-the-rule-about-running-out-of-the-base-path-#:~:text=In%20general%2C%20runners%20may%20run%20well%20out-side%20of,rather%20than%20slowing%20down%20to%20cut%20sharp%20corners, last accessed 9/13/20. *See also* https://www.umpirebible.com/index.php/rules-base-running/basepath-running-lane, last accessed 9/3/20.

weave only for so long.  She may even round third and think she's heading home, but that doesn't matter.  An out is still an out.  And the District Court already found NPF is out.

There is more.  NPF snubbed the ump after having been called out.  As I noted above, I recently urged the parties four more times to try to reach at least some minimal accommodation of their dispute over fees and costs, even if it should be without prejudice to the ultimate outcome of the pending motion.[134]  And they had many more occasions to try to do so on their own—with encouragement from the presiding District Judge who had already granted one of the SY Dawgs' sanctions motions.[135]  Instead, NPF held fast to its strategy.  That the parties failed to settle their differences is, of course, not the problem.  Rather, it's the failure of NPF's counsel, who apparently were too busy with other cases, even to respond to the SY Dawgs' lead counsel who was just trying to set up a date and time to meet and confer to comply with my order of October 16, 2019.[136]  There's a reason major league managers never find room on their rosters for a batter who insists on always swinging for the fence.  Nothing more needs to be said.

NPF and its attorneys failed to cooperate in discovery at least due to their willfulness and fault, and possibly their bad faith.  The SY Dawgs were seriously prejudiced by NPF's failure to cooperate in discovery.  The docket highlights set forth earlier in this report and recommendation paint only part of the picture of the problems the SY Dawgs faced due to NPF's repeated discovery intransigence.  The warnings from the Court about possible

---

[134] ECF #219, 224, 226, 230.
[135] ECF #197, at 42-43.
[136] ECF #222.

sanctions couldn't be any clearer.  The District Court posed the question of whether lesser sanctions could be imposed short of dismissal, even gave NPF's lawyers time to brief the issue.[137]  No briefing was forthcoming except for a repeat of NPF's insistent denial of having done nothing wrong.  No accommodation was ever reached.

After reviewing the record in this case and hearing argument from the parties' counsel on the SY Dawgs' pending motion, I find that the numerous discovery violations committed by NPF and its lawyers as set forth by the SY Dawgs during the May 23, 2019 hearing before the District Judge, reiterated during oral argument before me on July 13, 2019, and highlighted in the SY Dawgs' written submissions in conjunction with their pending motion did in fact occur.  I further find that those violations, all of which implicated both NPF and its lawyers, continued unabated notwithstanding the District Court's orders requiring NPF's compliance with the SY Dawgs' discovery requests, requests made by the District Court, and the federal discovery rules governing civil cases. For these foregoing reasons, I recommend that the District Judge grant the SY Dawgs' pending motion.

*Calculating the Sanctions Amount.*  It is now my task to determine what amount of money constitutes a reasonable sanction in light of NPF's discovery violations.  First and foremost, I must calculate a monetary amount that fits as closely as possible the breadth and depth of the discovery violations.  By their nature, these sanctions have both a punitive and a financial impact.

---

[137] *See*, *e.g.*, ECF #197, at 41-42.

Along with my recommendation, I set forth alternative calculations to assist the District Judge in reviewing this report and recommendation.  As I noted at the outset, I was not present for all of the in-court proceedings when NPF's misconduct occurred or was at issue, and did not participate in all of the earlier decision-making regarding that misconduct.  Determining the appropriate sanctions amount requires judicial assessment of a party's or a lawyer's conduct in the context of the entire case, especially now that we calculate the sanctions amount at the end of the case.  Presenting the alternative calculations adds context to this determination and my recommendation.

My explanations below and the addendum are intended to make clear how I derived my recommended sanctions amount.  I determined the recommended amount based on my review of the entire record, the written submissions related to the SY Dawgs' pending motion, the parties' oral arguments, and the evidence presented at the oral argument on the pending motion on July 13, 2020.  This determination was made more difficult by the fact that NPF continues to insist that it has violated no rule or order and, therefore, owes nothing.  This strategy now backfires on NPF and its lawyers.  Aside from the rough ballpark figure counsel for the SY Dawgs provided during the oral argument on their motion,[138] neither party has broken down with any particularity the monthly figures the SY Dawgs provided to reflect their respective views on what an appropriate sanctions amount

---

[138] ECF #238, at 17: "Well, the way—the reason I answered the way that I did, we—we have about $300,000 in fees in the discovery stage in this case, which I could add everything that happened after the preliminary injunction decision.  There was nothing else done on this case since then besides discovery, motions practice about discovery, sanctions practice about discovery, hearings about discovery.  So that—I would say $300,000 to the unsuccessful effort to engage in discovery in this case."

under Fed. R. Civ. P. 37 would be.  But this determination is not an all-or-nothing proposition.  Some fees and costs incurred in this case remain within the American Rule, because they have nothing to do with discovery violations.  Finding that dividing line is part of the task left to me.

Step One:  To calculate the appropriate sanctions amount, I created the Excel workbook found in the addendum.  I built it around the Excel spreadsheet the SY Dawgs presented at the oral argument on this motion.[139]  I reproduced their spreadsheet on the left-hand side of tab 1 of the addendum ("Exh. 23--without formulas shown").  This spreadsheet lists how much money the SY Dawgs spent on fees and costs for their defense broken down by month, by time billed, and by individual timekeeper.  I reviewed the billing rates used in this spreadsheet,[140] and find them to be reasonable and in line with going market rates. I further find that none of the entries reflects any excessive time spent on the tasks described, but rather are, like the billing rates, reasonable and market-appropriate.

Step Two:  I reviewed the monthly entries, and highlighted in red items that appear reasonably to relate to NPF's discovery violations.  I then included the fees and costs for those month in the initial sanctions amount.  These numbers are in Column S captioned "Monthly Costs and Fees re Discovery Violations."  The total gross amount of fees and costs related to NPF's discovery violations is $289,868.55.

Step Three:  Using the monthly amounts for fees and costs has two shortcomings. In most cases, these amounts include time spent and costs incurred on work related to the

---

[139] ECF #235, Exh. 23.
[140] ECF #235, Exh. 24.

discovery violations as well as time spent and costs incurred on other work for the case. This first shortcoming is not significant, because the highlighted items far outnumber the non-highlighted items for most of the monthly entries used in the calculation. The second shortcoming is that it is possible some of the fees and costs associated with highlighted items were not entirely related to addressing NPF's discovery misconduct. (By the same token, there could be undercounting where I did not highlight items that in fact related to work addressing NPF's discovery misconduct.) This may be particularly true for the entry of $25,000 for costs incurred by SY Dawgs, LLC, which are included in the total gross amount. I included these costs because SY Dawgs, LLC is the only defendant in the case since the beginning. It bore the brunt of the discovery abuses for the longest period, and thus likely suffered the largest impact due to the case's sheer longevity.

To address these shortcomings in using the gross monthly figures and to ensure no over-counting, the worksheet at tab 1 includes an interactive calculator that automatically reduces the total gross amount of costs and fees related to NPF's discovery violations by whatever percentage the user deems appropriate.

I recommend that 75% of the total amount be used, which results in a preliminary sanctions amount of $217,401.41. I recommend the use of 75% for two reasons.

First, as can be seen in the shaded Column S on the right-hand side of the worksheet, this amount includes no fees or costs prior to June 2018. It also includes no fees or costs from Stibbs & Co., because all of their work was done prior to June 2018.[141] Discovery

---

[141] ECF #235, Exh. 26.

problems began to surface in June 2018, which is when the SY Dawgs filed their first sanctions motions.[142] By that time, though, the defense had accrued 24.8% of the total fees and costs that would ultimately be expended, as indicated in Column Q. That means roughly 75% of the defense's fees and costs were subject to some expenditures related to NPF's discovery violations. With that ratio in mind, it seems reasonable to reduce the remaining three-quarters of the total by that same ratio amount to account for monthly entry items I highlighted that may not have encompassed solely fees and costs related to NPF's discovery violations as well as entry items I did not highlight that may have included fees and costs related to NPF's discovery violations.

Second, this case could have been resolved shortly after the District Judge adopted my report and recommendation to deny NPF's motion for a preliminary injunction at the end of May 2018.[143] All the way through May 23, 2019 when the District Judge held a hearing on the SY Dawgs' two motions to dismiss and NPF's motion for a default judgment, NPF continued on the same path that prompted the SY Dawgs' first motion for sanctions in June 2018. As I noted above, NPF didn't seem to get the message from the Court or heed the clear warnings that were being sent its way. Consequently, no one could be faulted for concluding that 100% of the total gross amount for entries containing items related to NPF's discovery violations should be used as the appropriate sanction.

As an aside, I note that the fees and costs in the spreadsheet end in June 2020, though I assume defense counsel didn't work for free when it prepared for the oral argument on

---

[142] ECF #59.
[143] ECF #51.

the pending motion held on July 13, 2020.  That oral argument would not have occurred if NPF had not violated its discovery obligations or orders.  In short, the calculation of the sanctions amount inevitably reflects some undercounting.

Nevertheless, it is appropriate to err on the side of caution and reasonableness when calculating the sanctions amount.  Taking 75% of the total gross amount from Column S provides a filter of sorts that tailors the sanctions amount more closely to the discovery violations by rectifying any potential over-counting.

Step Four:  I recommend that prejudgment interest be assessed as part of the sanction in this case.  Prejudgment interest takes into account the fact that the recipient should not have had to spend the money in the first place.  It compensates the recipient for the lost use of the money in the past, thereby making the recipient truly whole.

If the discount percentage explained in Step Three addresses possible over-counting, prejudgment interest addresses possible undercounting in the calculation of reasonable attorney's fees and costs.  It also serves as a mechanism to compensate the SY Dawgs for the lost interest value of funds they needed to spend over the two-and-a-half-year period to address NPF's persistent and repeated discovery intransigence—its recalcitrance in refusing to acknowledge, even in the briefing associated with the pending motion, that the District Judge had already found discovery violations.

Normally, no one would need to be concerned with prejudgment interest for Rule 37 sanctions, because the period from rule violation to sanction is generally short.  That's not so here.  The SY Dawgs had to deal with NPF's noncompliant behavior since at least June 2018.  Moreover, as I have discussed earlier in this opinion and as I discuss below,

this case could have been brought to a close far more quickly had NPF not engaged in its repeated discovery intransigence. As a consequence, the SY Dawgs suffered financially twice for NPF's discovery violations: the first time because they were forced to spend money to address those violations; and the second time because they were forced to spend money to protect their interests longer than would have been the case if NPF had cooperated during discovery, as it was required to do both by rules and court orders.[144] For these reasons, prejudgment interest in this instance furthers the purposes underlying Rule 37 by providing a more accurate calculation of the appropriate, reasonable attorney's fees and costs as a sanction in this case.

The summary chart of selected docket entries I set forth earlier reflects shameful litigation. In no case should any litigant have to file so many motions for sanctions or so many motions to compel basic discovery that the Court found to be relevant and fundamental to the case. Had NPF complied with the rules and provided that discovery when it was supposed to, the opportunities to bring this case to a quick resolution would have increased significantly. Moreover, with the requested discovery in hand, the SY Dawgs may have been in a position to short-circuit the case with a motion for summary judgment if settlement of the case was still unattainable.[145]

Prejudgment interest as a component of the sanction is also appropriate given the scope of the pending motion for attorney's fees and costs. The SY Dawgs brought their

---

[144] ECF #171, at 4 ("[t]he parties are directed to work cooperatively to finish discovery"); Local R. 26.1 ("[t]he parties are encouraged to cooperate with each other in arranging and conducting discovery").

[145] *See*, *e.g.*, ECF #201, at 8.

motion on three different theories for recovery of their fees and costs. While I recommend that the first two do not entirely fit this case, those were both close calls. The additional sanction of prejudgment interest, which in any event is not particularly significant monetarily speaking, reflects the fact that the arguments the SY Dawgs made on the first two theories were in the ballpark. The fact that the record allows us even to consider an argument that NPF exhibited bad faith by intentionally dragging out this litigation to create its own de facto injunction is troubling to say the least. While I do not recommend a finding of bad faith that would allow the SY Dawgs to recover the full amount of fees and costs incurred in their defense, that was another close call. That should never have to be the case in litigation brought in any court in this country, let alone a federal court. Prejudgment interest compensates the SY Dawgs for having had to expend their funds to address NPF's use of stonewalling discovery tactics in this manner, and in the process abusing the discovery process to suit its own ends. And all of this in a case where the District Judge found that "[i]t is impossible to argue that discovery in this case is unduly complex or cumbersome."[146]

I recommend post-judgment interest for these same reasons to be calculated under 28 U.S.C. § 1961.[147] I am unable to recommend a specific interest rate by which the post-judgment interest would be calculated, because § 1961 uses the weekly average 1-year constant maturity Treasury yield "for the calendar week preceding. the date of the

---

[146] ECF #151, at 4.
[147] *Aslani v. Sparrow Health Sys.*, No. 1:08-CV-298, 2010 WL 4135036, at *17 (W.D. Mich. July 16, 2010) (imposing post-judgment interest on Fed. R. Civ. P. 37 attorney's fees and costs).

judgment."[148]  Were the judgment to be issued today, that interest rate would be 0.1280% as indicated in tab 4 of the addendum, compounded annually.[149]

Columns U, W, and Y of the addendum calculate prejudgment interest several different ways.  Columns U and W calculate prejudgment interest using a simple average annual interest rate based on the daily yield rates for a 1-year Treasury bill with a constant maturity from January 1, 2018 through September 22, 2020.[150]  The data and manner used to calculate this interest rate are contained in tab 3 of the addendum ("1-Year TBill Constant Daily").  The source of this data is the Federal Reserve Bank.  These calculations use the type of Treasury bill specified in 28 U.S.C. § 1961(a).[151]  Column U figures reflect monthly compounding; Column W figures reflect annual compounding.

Column Y is slightly different in that it mirrors the interest calculation methodology in 28 U.S.C. § 1961(a), which is somewhat complicated because it uses a weekly average (as opposed to a daily) interest rate or yield.  That data is also available from the Federal Reserve Bank, and is provide in tab 4 ("1-year TBill Constant Weekly").  To mirror to the extent possible this methodology, the calculations in Column Y use the weekly average yields but averaged over the course of the entire month relevant to the particular monthly

---

[148] 28 U.S.C. § 1961(a).  The footnote to the original text of this code section indicates that the period after the word "preceding" in the statutory language probably should not appear.
[149] 28 U.S.C. § 1961(b).
[150] *See Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616 (6th Cir. 1998) (allowing a magistrate judge to calculate prejudgment interest on an award to pension plan participants using yield rates on 1-year U.S. Treasury bills rather than the interest rate mandated by state law).
[151] *See also* https://www.uscourts.gov/services-forms/fees/post-judgement-interest-rate/28-usc-1961-post-judgment-interest-rates, last accessed on 9/11/20.

timekeeper entry at issue.  For example, the interest rate applied to the June 2018 entry is the simple average of the weekly average interest rates for the five weeks ending in June that year.  Tab 4 of the addendum ("1-Year TBill Constant Weekly") shows these calculations.  Because this methodology mirrors most closely the one in § 1961(a), I recommend it be used for determining the appropriate sanctions amount.

One final note.  While calculations of this sort are made every day, Excel spreadsheets containing a lot of numbers can be daunting at first.  To make clear how I derived my recommended sanctions amount, I created tab 2 ("Exh. 23--with formulas shown").  This worksheet is identical to tab 1 except that it displays the underlying Excel formulas used in making the calculations.

In sum, I recommend that NPF and its lawyers be ordered to pay $224,863.80 to the SY Dawgs for NPF's discovery violations as a sanction under Fed. R. Civ. P. 37 with post-judgment interest as calculated in the manner set forth in 28 U.S.C. § 1961 with such interest to accrue starting 30 days from the date of the District Court's order.

### III.

As in softball, nothing in litigation is perfect.  A batter might hit what seems to be a towering home run, but something slightly off in the swing mechanics prevents the ball from clearing the fence.  Or a runner on first base notices sun glare is distracting the pitcher, so she takes off for second to steal a base.  A lawyer may throw out an argument or two that seem persuasive and have legal support, but the court rejects the position anyway.

There's no bad faith in any of that. That's how the game is played, and that's how cases are litigated.

Rules, though, make sure the game is played fairly.[152] Otherwise, it quickly devolves into chaos. That's why we have umpires, and that's why we have judges.

NPF broke the rules. Now it has to pay. It is my recommendation that the defendants' motion for fees and costs[153] be granted. I further recommend that, as a sanction for its discovery violations, NPF and its lawyers of record be ordered to pay the defendants $224,863.80 with post-judgment interest as calculated under 28 U.S.C. § 1961 with joint and several liability attaching to this sanction.

* * * * * *

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of service of this notice. Failure to file timely objections within the specified time shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. Absent objection, a district court may adopt this Report and Recommendation without review.[154]

Dated: September 24, 2020            s/ William H. Baughman, Jr.
                                     United States Magistrate Judge

---

[152] *See, e.g.,* https://www.sportsrec.com/4817218/asa-fastpitch-softball-rules, last accessed on 9/16/20.
[153] ECF #212.
[154] *See* Local Rule 72.3(a); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).